IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LORI WALKER,                                    CV-07-6365-MA

          Plaintiff,                            OPINION AND ORDER

v.

MICHAEL ASTRUE,
Commissioner of Social
Security,

          Defendant.

KATHRYN TASSINARI
BRENT WELLS
Harder, Wells, Baron & Manning, P.C.
474 Willamette, Suite 200
Eugene, OR 97401
(541) 686-1969

          Attorneys for Plaintiff

KARIN J. IMMERGUT
United States Attorney
BRITANNIA I. HOBBS
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1158


1 - OPINION AND ORDER

RICHARD M. RODRIGUEZ
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-3748

          Attorneys for Defendant

MARSH, Judge.

     Plaintiff Lori Walker seeks judicial review of a final
decision of the Commissioner denying her November 1, 2004,
applications for disability insurance benefits and supplemental
security income benefits ("benefits") under Titles II and XVI of
the Social Security Act, 42 U.S.C. §§ 401-33 and §§ 1381-83f.

     Plaintiff alleges she has been disabled since June 15, 1999,
because of severe fatigue and muscle/joint pain.  She first
applied for benefits in June 2001.  Her claim was denied and she
did not appeal.  On April 10, 2002, plaintiff filed the pending
application for benefits, alleging essentially the same disabling
impairments.  An Administrative Law Judge (ALJ) held a hearing in
July 2004, at which plaintiff, a caregiver, and a  vocational
expert testified.  In January 2005, the ALJ found plaintiff was
not disabled.  The Appeals Council denied review.  Plaintiff then
filed an action in this court.  In June 2006, this court, based
on the stipulation of the parties, remanded the matter for
reevaluation of plaintiff's residual functional capacity (RFC)
and to obtain additional vocational expert (VE) testimony in

2 - OPINION AND ORDER

light of the reevaluated RFC.  On August 24, 2007, the ALJ again issued a decision that plaintiff was not disabled.  The Appeals Council denied plaintiff's request for further review.  The ALJ's August 2007 decision, therefore, was the Commissioner's final decision for purposes of judicial review.

Plaintiff seeks an Order from this court reversing the Commissioner's final decision and remanding the case for the immediate payment of benefits or for further proceedings.  For the following reasons, I **AFFIRM** the final decision of the Commissioner and **DISMISS** this action with prejudice.

## THE ALJ'S FINDINGS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled.  Bowen v. Yuckert, 482 U.S.137, 140 (1987).  See also 20 C.F.R. § 416.920. Plaintiff bears the burden of proof at Steps One through Four. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  Each step is potentially dispositive.

At Step One, the ALJ found plaintiff has not engaged in substantial gainful activity since April 1, 2001, the alleged onset date of her disability.

At Step Two, the ALJ found plaintiff suffers from fibromyalgia and asthma, which are severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c)(an impairment or

combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activities).

At Step Three, the ALJ found these impairments do not meet or equal listed impairments.  20 C.F.R. § 404.1520(a)(4)(iii) and (d), and § 416.920 (a)(4)(iii) and (d).  The ALJ found plaintiff has the residual functional capacity to perform sedentary to light exertion work, with a sit/stand option.  She can occasionally bend, crawl, and crouch.  She should avoid concentrated exposure to fumes and gases and exposure to hazards.  She is limited to simple 1-2-3 step work with limited interaction with the public.

At Step Four, the ALJ found plaintiff is unable to perform her past relevant work as a hairdresser, car wash attendant, hostess, child care worker, cocktail waitress, or bartender.  She is able to perform the jobs of small products assembler, electronics worker/packager, and sporting goods assembler, which exist in significant numbers in the national economy.

Consistent with the above findings, the ALJ found plaintiff was not under a disability and denied her claim for benefits.

<u>**LEGAL STANDARDS**</u>

The initial burden of proof rests on the claimant to establish disability.  <u>Roberts v. Shalala</u>, 66 F.3d 179, 182 (9th Cir. 1995), <u>cert</u>. <u>denied</u>, 517 U.S. 1122 (1996).  To meet

4 - OPINION AND ORDER

this burden, the claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C § 423(d)(1)(A).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).  The duty to further develop the record, however, is triggered only when there is ambiguous evidence or when the record is inadequate

to allow for proper evaluation of the evidence.  Mayes v.
Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001).  One of the
means available to an ALJ to supplement an inadequate medical
record is to order a consultative examination, i.e., a physical
or mental examination or test purchased for [a claimant] at
[the Social Security Administration's] request and expense.
20 C.F.R. §§ 404.1519, 416.919.  Reed v. Massinari, 270 F.3d 838,
841 (9th Cir. 2001).

    The decision whether to remand for further proceedings or
for immediate payment of benefits is within the discretion of the
court.  Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.), cert.
denied, 121 S. Ct. 628 (2000).  "If additional proceedings can
remedy defects in the original administrative proceeding, a
social security case should be remanded."  Lewin v. Schweiker,
654 F.2d 631, 635 (9th Cir. 1981).

### ISSUES ON REVIEW

    Plaintiff contends the ALJ erred in (1) failing to give
clear and convincing reasons for rejecting her testimony,
(2) failing to give clear and convincing reasons for rejecting
the medical opinions of treating physician Roberta Bulger, M.D.,
and consulting examining physicians Robert J. Tilley, M.D., and
Raymond D. Brumbaugh, M.D., and, (3) finding plaintiff retains
the RFC to perform other work in light of limitations described
by plaintiff's treating physicians.

6 - OPINION AND ORDER

## PLAINTIFF'S EVIDENCE

The following evidence is drawn from plaintiff's hearing testimony at two hearings (July 2004, and April 2007), her disability applications, and work and earnings history reports.

Plaintiff was 39 years old on the date of the April 2007, hearing before the ALJ.

In the first hearing in 2004, plaintiff testified that she has an associates degree in applied science and cosmetology. Her past relevant work includes jobs as a carwash attendant, hostess, hairstylist, waitress, and bartender. She last engaged in substantial gainful activity in June 1999, when she was terminated for missing too many days of works. She also worked 20 hours a week as a hairstylist for three months in 2000, while she was attending classes to get an associates degree in business, but she quit because "it was too much for me to do." She was too tired to go to classes, and could not perform her hairstylist job because the pain in her hips and knees prevented her from standing, and the pain in her hands and shoulders made it difficult for her to cut hair.

Plaintiff has constant pain in her shoulders, hands, fingers, hips, knees, feet, and toes. Any activity, including cleaning and cooking increases her pain. She has bouts with "flu-like symptoms once a month."

7 - OPINION AND ORDER

On a daily basis, plaintiff takes Percocet, Ibuprofen, and Amitriptyline for pain, Zocor for high cholesterol, and Albuterol and Advair (inhaler) to treat her asthma.

Plaintiff has difficulty breathing around chemicals used in hair sprays, colored dyes, perfumes, and skin lotions.

Plaintiff has a care-giver at home who does all the household chores and helps her with grocery shopping. She does not drive. She leaves the home for doctors' appointments and about once a month to visit relatives. She can walk for 20-30 feet at a time, and is able to sit for about 30 minutes. She uses a cane to ambulate because of the pain in her left hip and knee. Her hip pain has increased over time.

In the April 2007 hearing, plaintiff testified she was undergoing a medical evaluation to determine whether treatment was necessary for hepatitis C. Her fatigue and pain varies from day-to-day but is worse than when she testified in 2004. She feels pain regularly and it is equally severe in her toes, ankles, knees, left hip, hands, fingers, right shoulder, and lower back, and occasionally in her right hip. The pain and fatigue are aggravated by anything she does, including light housekeeping. Once or twice a week she has bad days when she lays in bed or on the couch all day. She uses a cane all the time, including at home because of balance problems and the pain in her left hip.

Plaintiff relies on an unpaid care-giver who lives with her but works outside the home during the day. She drives plaintiff around, does the household chores and cooking, helps with the grocery shopping, and helps plaintiff bathe herself and do her hair. Plaintiff tries to walk in the home a "couple of minutes a day." She is unable to lift a gallon of milk. She continues to smoke 3-5 cigarettes each day despite having asthma. She has not used marijuana since 2005.

## MEDICAL TREATMENT EVIDENCE

Plaintiff's medical records are voluminous. The summary includes only those that pertain specifically to the issues before the court and exemplify plaintiff's claimed impairments.

### Roberta Bulger, M.D. - Family Practice.

Dr. Bulger began providing general health care to plaintiff in 1994. In August 1999, plaintiff complained of "utter fatigue" and "sleeping 10-12 hours at night." She reported she had lost her job because of missing so many days of work. On exam, she had tenderness above the shoulder blade on both sides, in the soft tissue above her elbows and knees, the short biceps tendon insertion area (below the elbow) and her left forearm. Her joints appeared normal.

In November 1999, plaintiff was not as fatigued every day but she did not feel like getting out of bed on some days.

In February 2000, Dr. Bulger wrote a note "[t]o whom it may concern" that plaintiff cannot work, that "she has been suffering for some time with marked fatigue, aching, and headaches . . . and she cannot tolerate the physical activity." Several weeks later, she wrote that plaintiff "has chronic fatigue syndrome. She is too exhausted." In September 2000, Dr. Bulger wrote a similar note that she had "diagnosed plaintiff with chronic fatigue syndrome. She is not a malingerer."

In August 2001, Dr. Bulger reported that plaintiff could only work for one hour before taking a 30-45 minute break and lift only 5 lbs because of lack of energy.

In July 2002, Dr. Bulger submitted a form requesting that plaintiff's student loans be cancelled on account of disability based on chronic pain syndrome, fibromyalgia, and "overwhelming" and worsening fatigue.

In February 2003, Dr. Bulger noted plaintiff's fingers were starting to deform and she revised her diagnosis to rheumatoid arthritis and again opined that plaintiff was disabled.

Gerald Schoeplin, M.D. - Rheumatologist.

In January 2001, Dr. Schoeplin, on referral from Dr. Bulger, examined plaintiff for chronic fatigue syndrome. He diagnosed fatigue, headaches, generalized musculoskeletal pain. Plaintiff described becoming very fatigued about two months after an

10 - OPINION AND ORDER

incident when she fell at a nightclub while she was inebriated.

In April 2003, Dr. Schoeplin examined plaintiff again and diagnosed rheumatoid arthritis.

In June 2003, plaintiff described her pain level at 8 on a 1-10 scale, with pain greater in the left hip and left knee. She described morning stiffness for 60-90 minutes in her knees, hips, shoulders, elbows and hands. Dr. Schoeplin made a "challenging diagnosis [including] acute rheumatoid arthritis in the left hip and left knee with effusions and possibly ruptured baker's cyst in the left calf, septic arthritis in the left hip, deep vein thrombosis in the left thigh."

In October 2003, plaintiff again described her pain level as about 8 on the 1-10 scale.

In November 2003, plaintiff's self-described pain level had risen to level 9. Dr. Schoeplin's assessment of her pain level was substantially lower. He added the following addendum to his report in connection with plaintiff's request that he complete a low rent housing request:

> It is my impression that she does have rheumatoid arthritis but she is amplifying the pain. I have looked for evidence of secondary gain. Having presented to me the need to sign for a live in aid today makes me wonder whether that could be a motivation. I have filled out the form indicating that a live in aid is helpful but not essential.

Tr. 347.

In December 2003, Dr. Schoeplin repeated his concern that plaintiff exaggerated her pain for purposes of secondary gain.

In August 2004, a diagnostic film of plaintiff's left hip showed mild narrowing in the joint space. Dr. Schoeplin noted the hip joint appeared normal.

In April 2005, Dr. Schoeplin again noted the diagnostic challenge presented by plaintiff and he continued to "lean towards rheumatoid arthritis."

In May 2006, Dr. Schoeplin treated plaintiff for multiple joint pains and left hip pain. He noted it "has always been difficult for me to separate organic from functional features on the exam."

Diane Pratt, M.D. - Family Practice.

In November 2002, Dr. Pratt performed a physical examination and diagnosed asthma with a "tobacco use disorder," sinusitis, and myalgia.

In March 2003, Dr. Pratt also noted arthritis. On exam, plaintiff exhibited tenderness in all large joints. An x-ray of plaintiff's hands and left great toe were normal.

In June 2003, plaintiff complained of increased pain in her left hip and left knee. On examination, there was no effusion or increased warmth in plaintiff's hip or knee joints, but she exhibited decreased range of motion in her hip, secondary to

pain, probably caused by rheumatoid arthritis.  She also had pain in the small joints of her hands but no other evidence of joint deformities or effusions.

In September 2003, plaintiff's rheumatoid arthritis seemed about the same.  Her pain was concentrated mostly in her left hip and she was walking at least twice a day with a cane.  She continued to have high cholesterol but had not changed her diet.

In an October 2003 examination, Dr. Pratt did not see any inflamed joints although there was some swelling and effusion in the small joints of her hands.  Plaintiff mentioned that she had been hospitalized the week before for headaches, neck pain, body aches, and fever, and had been diagnosed with viral meningitis. She was now better.

In December 2003, Dr. Pratt signed a "Low Rent Housing Request for Live-in-Aide" for plaintiff based on diagnoses of rheumatoid arthritis, reactive airway disease, and high cholesterol.  She opined such assistance was "helpful to the patient, but not essential."  She also noted plaintiff "has managed quite well in the last two years with this same aide."

In January 2004, plaintiff complained of a "lot of discomfort" because of her arthritis, with 2 1/2 hours of morning stiffness each day.  On examination, she had "fairly good" range of motion although she moved slowly.

In February 2004, plaintiff complained of pain, worse in her

left hip, back, knees, and feet. She stated she was always in pain and had low energy. On examination, her joints showed minimal effusion, but there was some swelling in the joints of both hands. Dr. Pratt concluded plaintiff "has a lot of pain without significant physical findings . . . and no real effusion in her joints to correspond to the significant pain which she is describing."

In March 2004, at plaintiff's request, Dr. Pratt wrote a letter that plaintiff would not be able to work for the entire year because of chronic Rheumatoid Arthritis.

In April 2004, plaintiff complained of pain that was worse in her shoulder, left hip, back, and knees. She did not have too much trouble with her fingers and hands. She sat at home most days and took 3-4 hot baths daily. Plaintiff's pain was being treated with narcotics. She signed a pain contract in order to be prescribed Endocet (Oxycodone and Acetaminophen). Plaintiff was open to trying acupuncture.

In June 2004, Dr. Pratt opined that plaintiff was "completely disabled by her discomfort and pain in her joints and muscles." Dr. Pratt noted there was "some component to fibromyalgia."

In a July 2004, letter to plaintiff's attorney, Dr. Pratt stated she was not qualified to make disability determinations. When she first examined plaintiff, "it was my understanding she

14 - OPINION AND ORDER

had Disability based on her Rheumatoid Arthritis.  When she
comes into the office, she moves very slowly and appears to be
in a great deal of pain." Dr. Pratt treated plaintiff for
fibromyalgia, rheumatoid arthritis (with no joint inflammation),
asthma (well-controlled), and high cholesterol.

In August 2004, plaintiff stated she was doing "pretty well
lately" but had a "fibromyalgia flareup" with muscle and joint
pain.  She continued to walk with a limp.  Dr. Pratt wrote to
Dr. Schoeplin that plaintiff's pain "seems to be fairly well
controlled on her current medication regimen."  Laboratory
results were normal.

In October 2004, Dr. Pratt received a report that plaintiff
had tested positive for marijuana use, which was "inconsistent
with continuing to receive narcotics."  Plaintiff agreed to stop
using marijuana.  Dr. Pratt referred plaintiff to Mental Health
for substance abuse evaluation/treatment.

In November 2004, Dr. Pratt noted plaintiff had again tested
positive for marijuana use and she decided to wean plaintiff off
narcotics medication.  There was no sign of joint inflammation.

In December 2004, plaintiff complained of worse pain in her
hands and left shoulder.  There was no sign of inflammation or
deformity in her joints.  She had a flareup of asthma and
expressed a desire to decrease her smoking.

In January 2005, plaintiff had normal range of motion in her

shoulder and no change in her joints.

In May 2005, Dr. Pratt wrote a letter indicating plaintiff "by her own admission, states she is disabled and unable to work because of severe muscle and joint stiffness, causing constant pain." She noted that when plaintiff comes to her office, she "does move very slowly and appears to be in a great deal of pain. Her physical exam reveals stiffness in the joints but no real synovitis (joint inflammation)." Dr. Pratt again stated she was not qualified to make a disability determination and recommended "full physical capacities testing as well as psychological testing."

In June 2005, plaintiff had a fair amount of pain from fibromyalgia, and right foot pain for which she was planning surgery. Plaintiff was considering nicotine patches to help her stop smoking.

In October 2005, Dr. Pratt completed a Functional Limits Questionnaire for a "JOBS Program" and indicated plaintiff was disabled by pain for 60 days. Plaintiff was reconsidering the planned surgery on her foot because she was not comfortable with the surgeon.

In February 2006, plaintiff's extremities showed no obvious abnormalities.

In June 2006, Dr. Pratt recommended plaintiff undergo a physical capacity test and consider a vocational rehabilitation

program.  Plaintiff was willing to do so.

In August 2006, plaintiff's fibromyalgia was "basically stable" and she was encouraged "to continue be as active as possible."  She was also again encouraged to quit smoking.

In December 2006, plaintiff's fibromyalgia symptoms were "fairly good" and her hips and hands were improved.  Her feet were still painful.  She was willing to go to the "Fibromyalgia Clinic."

Michael D. Buck, M.D. - Gastroeneterologist.

In January 2007, Dr. Buck evaluated plaintiff's hepatitis C disease and concluded it was not serious and that plaintiff had a "very low, perhaps even undetectable viral load."

**MEDICAL EVIDENCE - EXAMINING CONSULTANTS**

Robert Irwin, M.D., - Internal Medicine.

In October 2001, Dr. Irwin examined plaintiff for her complaint of chronic fatigue syndrome in connection with her first application for disability benefits.  He found she exhibited 3 out of 18 American College of Rheumatology (ACR) tender points relating to a potential fibromyalgia diagnosis.  He was unclear whether her purported lower extremity weakness was due to decreased effort and thought that such weakness, if not due to lack of effort, would suggest neurologic etiology.  He also diagnosed tobacco abuse and noted she was not compliant in taking her asthma medications.

Raymond Brumbaugh, M.D. – Rehabilitation Specialist.

In January 2003, Dr. Brumbaugh examined plaintiff on behalf
of Disability Determination Services (DDS). Plaintiff reported
diffuse pain in all her joints, with severe fatigue, myalgias,
and arthralgias. Her stated pain levels on a 1 to 10 scale
ranged from 4 at the lowest, 5-6 on average, and 8 at the worst.

Plaintiff was unable to do repeated squats. She climbed up
and down a flight of stairs slowly but was not short of breath.
Her blood pressure did not increase but her pulse rate went from
60 to 90 per minute. She complained of bilateral hand weakness
and numbness and generalized left leg weakness and numbness.

On examination, Dr. Brumbaugh noted plaintiff had
significant complaints of fatigue that were separate from her
pain. She had generalized unexplained weakness, more on the left
than the right, except that her effort as to manual muscle
testing appeared to be "questionable." Plaintiff had difficulty
maintaining herself on her toes during toe walking, but it was
"difficult to tell whether this represent[s] true weakness or
poor effort." She reported pain during passive ranging of her
shoulders. Dr. Brumbaugh again questioned plaintiff's effort
regarding muscle strength testing.

Based on the examination, without regard to possible lack of
effort, Dr. Brumbaugh concluded plaintiff could walk less than
four hours each day, sit for three-four hours each day, and stand

for 20-30 minutes at a time.  She would not be able to carry more than 10 lbs on a frequent basis.  She may have limited ability to manipulate objects in her left hand.  Travel was not recommended.

Robert J. Tilley, M.D. - Family Practice.

In September 2004, Dr. Tilley reviewed plaintiff's medical records and examined her.  From his records review, Dr. Tilley agreed with a diagnosis of rheumatoid arthritis with likely progression of the disease, but opined plaintiff did not suffer from chronic fatigue syndrome.  He noted there was some indication of secondary gain and concern regarding narcotics use, but also noted the references were "cryptic and few and far between."  He thought with "appropriate long-term pain management this patient may well exhibit a greater degree of functionality" with less dependence on narcotics.  In fact, he questioned the need for narcotics and stated "the degree of limitation in activity and degree of pain that she is currently experiencing [was] outside the curve of [his] experience."  He thought an "independent evaluation of her functional capabilities" without [her] knowledge would show a greater degree of functionality.

In his examination, Dr. Tilley opined plaintiff "did not seem to be attempting to exaggerate her pathology."  He did not find "[p]hysical findings characteristic of rheumatoid arthritis" but noted the "beginnings of some digit malformation."  He opined that workplace limitations would include lifting less than 10 lbs

frequently and 20 lbs occasionally, standing and walking less than 2 hours and sitting less than 6 hours in an 8-hour work day, limited pushing and pulling in the upper extremities, occasional balancing and stooping, and no climbing, kneeling, crouching, or crawling.  He also found plaintiff had limited reaching ability, frequent gross and occasional fine manipulation ability, and unlimited skin feeling.  She had no visual, communicative, or environmental limitations.

Kim Jones, N.P., Ph.D.  Family Nurse Practitioner.

In February 2007, Dr. Jones evaluated plaintiff at the request of Dr. Pratt.  She reviewed plaintiff's medical history and examined her.  She noted plaintiff exhibited all 18 ACR tender points that supported a diagnosis of fibromyalgia.  A neurological examination was normal.  Plaintiff had full range of motion in the small joints of her hands and feet and she was strong and equal bilaterally.  Her muscle tone was appropriate, tremors were absent, and her grip strength was equal.  Sharp and dull sensation was appropriate.  Plaintiff's hand and foot coordination and gait were normal.

Dr. Jones diagnosed plaintiff as having Fibromyalgia, chronic fatigue syndrome, questionable Hepatitis C induced arthritis rather than rheumatoid arthritis, restless leg syndrome and left trochanteric bursitis.

**MEDICAL EVIDENCE - CONSULTING PHYSICIANS**

<u>Martin Kehrli, M.D. - Physical Medicine/Rehabilitation</u>.
<u>Mary Ann Westfall, M.D. - Physical Medicine/Rehabilitation</u>.

Dr. Kehrli reviewed plaintiff's medical records.  He noted a history of chronic fatigue syndrome, asthma, and headaches.  He concluded plaintiff had the residual functional capacity to occasionally lift 50 lbs and frequently lift 25 lbs, stand, walk, and sit for six hours in an eight-hour workday, and had limited ability to push or pull in the upper extremities.  She could occasionally climb, balance, stoop, kneel, crouch, and crawl.  She should avoid concentrated exposure to fumes.

The only limitation Dr. Westfall recommended was that plaintiff should avoid concentrated exposure to fumes.

**ANALYSIS**

**1.   Rejection of Plaintiff's Testimony**.

The ALJ found plaintiff was not credible in describing the severity of her physical impairments and the degree of her incapacity.

A claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged. . . .'" (the <u>Cotton</u> test).  <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 344 (9th Cir. 1991) (quoting 42 U.S.C. § 423(d)(5)(A) (1988)); <u>Cotton v. Bowen</u>, 799 F.2d 1403, 1407-08 (9th Cir. 1986).  The claimant need not

21 - OPINION AND ORDER

produce objective medical evidence of the symptoms or their severity.  Smolen v. Chater, 80 F.3d 1276, 1281-82 (9th Cir. 1996).

   If the claimant meets the Cotton test and there is no affirmative evidence of malingering, the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony regarding the severity of his symptoms.  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  See also Smolen, 80 F.3d at 1283. To determine whether the claimant's subjective testimony is credible, the ALJ may rely on (1) ordinary techniques of credibility evaluation such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  Id. at 1284 (citations omitted).

   The AJL relied in substantial part on comments by examining physicians, Dr. Irwin, Dr. Brumbaugh, and Dr. Tilley, and treating physician, Dr. Schoepflin, that suggest they were concerned about the reliability of plaintiff's self-described physical limitations and impairments.  The ALJ also noted the comments by Dr. Irwin and Dr. Brumbaugh suggesting an apparent

22 - OPINION AND ORDER

lack of effort by plaintiff during her physical examinations.
The ALJ also referred to a comment by Dr. Tilley that the degree
of pain plaintiff exhibited was "outside the curve of [his]
experience," and that surreptitious testing might reveal
a greater degree of functionality.  Finally, he noted the concern
expressed by Dr. Schoepplin on two occasions regarding the
possibility that plaintiff was exaggerating her level of pain for
purposes of secondary gain.

Finally, the ALJ noted specific inconsistencies between
plaintiff's actual daily activities at certain times and her
claimed level of inactivity and fatigue.

On this record, I find the ALJ gave clear and convincing
reasons for not fully crediting plaintiff's testimony regarding
the degree of her functional limitations.

**2.    Rejection of Treating/Examining Physician Medical Opinion.**

An ALJ may reject the uncontradicted medical opinion of a
treating physician or examining physician only for clear and
convincing reasons that are supported by substantial evidence in
the record.  Lester v. Chater, 81 F.3d 821, 830-31, (9th Cir.
1995).  If a treating physician's medical opinion is supported by
medically acceptable diagnostic techniques and is not
inconsistent with other substantial evidence in the record, the
treating physician's opinion is given controlling weight.  Id.

a.  <u>Roberta Bulger, M.D. - Treating Physician</u>.

Dr. Bulger wrote brief notes on several occasions to the effect that plaintiff cannot work because of chronic fatigue syndrome.  She noted on one occasion that plaintiff could not work more than one hour each day because of exhaustion.

The ALJ rejected Dr. Bulger's opinions regarding plaintiff's ability to work because they were not supported by the treatment record and depend on plaintiff's discredited self-report of her symptoms and limitations.  The ALJ noted the several medical evaluations that reflected plaintiff's apparent lack of effort and symptom magnification.  The ALJ also noted the lack of any substantive evidence, including any strength testing done by Dr. Bulger, to support her opinion that plaintiff could not lift more than 5 lbs.

I agree with the ALJ that the record as a whole reflects that Dr. Bulger's cursory and general statements regarding plaintiff's functional abilities are based in large part on plaintiff's discredited self-reports and are contradicted by medical records from other treating physicians, including Dr. Schoeplin, and examining physicians.

b.  <u>Robert J. Tilley, M.D.- Examining Physician</u>.

Plaintiff notes that Dr. Tilley opined in one statement that in a normal eight-hour work-day, plaintiff could work for three hours sitting, two hours walking, and two hours standing).

Dr. Tilley, however, also reported in another statement that plaintiff could sit "less than 6 hours" and walk "less than 2 hours" in an eight-hour day.  According to plaintiff, because the total for each scenario equals less than eight hours, Dr. Tilley opined that plaintiff's limitations were disabling.

I disagree.  The ALJ largely credited Dr. Tilley's opinions regarding plaintiff's likely magnification of her physical impairments and his suspicion that she was capable of greater functionality than he was able to determine.  The ALJ, however, did not accept Dr. Tilley's purported limitation to a seven-hour workday, which if credited, would leave plaintiff unable to engage in substantial gainful activity.

Instead, the ALJ took into account the apparent ambiguity between Dr. Tilley's medical evidence, in which he suggested on several occasions that plaintiff's subjective complaints appeared to be exaggerated, and his disability assessment, which appears to accept at face value plaintiff's purported walking and standing limitations.  The ALJ also noted Dr. Tilley's opinion that plaintiff could sit "less than six hours" and walk less than two hours" did not include a "stand" option.  The ALJ explained that if Dr. Tilley's four-hour stand-walk limitation was combined with the "less than six hours" sitting limitation, plaintiff would be able to complete a normal eight-hour work-day.

25 - OPINION AND ORDER

On this record, I conclude that Dr. Tilley's standing, walking, and sitting limitations, when considered in conjunction with his skepticism regarding the reliability of plaintiff's subjective complaints, are not inconsistent with the ALJ's finding that plaintiff has the functional capability to work an eight-hour day.

Plaintiff also contends the ALJ improperly rejected Dr. Tilley's opinion regarding plaintiff's limitations in fine manipulation.  I disagree.  The ALJ pointed out that, although plaintiff's "[r]ange of motion of the digits was markedly limited, [] there was no apparent anatomic restriction of motion. There was little joint destruction and no evidence of inflammation."  The ALJ also noted that in a "recent examination, [plaintiff] exhibited full range of motion of the small joints of her hands with no swelling."

On this record, I find the ALJ gave clear and convincing reasons for rejecting Dr. Tilley's opinion regarding plaintiff's limitation as to fine manipulation.

    c.  Raymond D. Brumbaugh, M.D.

Dr. Brumbaugh opined that plaintiff could walk less than four hours, sit three-four hours if allowed to change positions, and stand for 20 minutes at a time in an eight-hour day. Plaintiff contends this indicated plaintiff cannot work a full eight-hour day.  The ALJ found these limitations reflect

26 – OPINION AND ORDER

plaintiff "appears capable of sustaining a full 8-hour workday given a sit/stand option." Plaintiff contends this opinion supports Dr. Tilley's opinion that plaintiff is only able to work a seven-hour workday.

I agree with the ALJ that if, as suggested by Dr. Brumbaugh, plaintiff has the ability to stand for 20 minutes at a time periodically throughout the day, she is able to work a full eight-hour day. Accordingly, the ALJ's finding is consistent with Dr. Brumbaugh's opinion.

3. <u>**Plaintiff's Ability to Perform Other Work**</u>.

Plaintiff contends the ALJ erred in finding plaintiff had the ability to perform other work in the national economy in light of her inability to work an eight-hour day and her functional limitations with fine manipulation.

As discussed above, the ALJ's finding that plaintiff can work a full eight-hour day is not inconsistent with the opinions of Dr. Tilley and Dr. Brumbaugh. In addition, Plaintiff has not established she has functional limitations with fine manipulation that preclude her from performing the jobs specified by the ALJ.

Accordingly, I conclude the record as a whole supports the ALJ's finding that plaintiff has the ability to perform other work.

## CONCLUSION

For these reasons, the Court **AFFIRMS** the final decision of the Commissioner and **DISMISSES** this action with prejudice.

IT IS SO ORDERED.

DATED this 29 day of January, 2009.


    /s/  Malcolm F. Marsh
       Malcolm F. Marsh
   United States District Judge